405 P.2d 905

**NATIONAL AUTOMOBILE AND CASUALTY INSURANCE CO., and Reed Bail Bond, Appellants,**

v.

**Evelyn L. QUECK, Appellee.\***

**1 CA–CIV 81.**

Court of Appeals of Arizona.

Sept. 29, 1965.

---

\* This appeal was filed with the Arizona Supreme Court and assigned that Court's Number 8095. The matter was referred to this Court pursuant to Section 12–120.-23 A.R.S.

V. L. Hash, Phoenix, for appellants.

Shimmel, Hill, Kleindienst & Bishop, by Richard E. Norling, Phoenix, for appellee.

CAMERON, Judge.

This is an appeal by the National Automobile and Casualty Insurance Company and Reed Bail Bond from a decision of the lower court forfeiting a $1,000 bond upon which the appellants were sureties.

We are called upon to determine the existence and nature of a writ of ne exeat under the constitution and laws of the State of Arizona and to interpret the effect of a bond in the amount of $1,000 given pursuant to a writ of ne exeat issued by the lower court.

The facts of the case are essentially as follows: On 28 March, 1961, the plaintiff, wife, Evelyn L. Queck, filed a complaint for divorce against the defendant, husband, Ernest E. Queck. An answer was filed and on 7 December, 1961, after a trial on the merits, the plaintiff was awarded a decree of divorce from the husband and the husband was ordered to pay alimony and child support. During the year and a half following the decree of divorce, the wife brought several proceedings upon orders to show cause why the husband should not be held in contempt for non-payment of the alimony and child support as provided in said decree. On 29 March, 1963, the Superior Court found the husband in contempt of court and made the following order:

"IT IS ORDERED continuing this matter until April 19, 1963, at 9:00 A.M., for purpose of review, and Defendant is instructed to appear and to present all evidence of income tax problem. The Court finds that there are arrearages to date in the amount of $617.50 together with additional costs in the sum of $9.50, and Defendant is Ordered to pay these sums on or before April 5, unless Mr. Norling is notified otherwise by the Defendant. IT IS ORDERED for $100.00 attorney fees to be paid within 3 months."

On 9 April, 1963, the wife filed a verified petition alleging the amount due and owing, alleging that additional sums had become due since the order of 29 March, 1963, and alleging,

"that your petitioner has reliable information and therefore believes that the defendant, Ernest E. Queck, is intending to leave the jurisdiction of this court prior to the 19th day of April, 1963; that this petition is predicated upon information received by your petitioner that defendant has issued to his employer a notice of termination of his employment and has stated to reliable witnesses his intention to leave the jurisdiction of this court prior to the time set for review on April 19, 1963."

The wife further stated that if the husband were allowed to leave the jurisdiction of this court without payment of arrearages, that the wife would be irreparably damaged. The wife then prayed that a writ of ne exeat be issued forthwith to prevent the defendant from leaving the State until he had paid said support arrearages and attorney's fees.

Upon the same day the court issued the following order:

"ORDER FOR WRIT OF NE EXEAT:

"Upon reading the plaintiff's verified petition on file and good cause appearing

"IT IS ORDERED that a writ of ne exeat staying the defendant, Ernest E. Queck, from departing into parts beyond this State and out of the jurisdiction of this Court without leave of Court first had, issue as prayed for in said petition, and that the Clerk endorse upon said writ that the defendant be required to give bond and security in the sum of one thousand dollars ($1,000.00).

"DONE IN OPEN COURT this 9th day of April, 1963, at 11:40 a.m.

/s/ Kenneth C. Chatwin,
Judge of the Superior Court."

The writ was issued and a sheriff on the same day took the defendant, Ernest E. Queck, into custody and upon his failure to post bond immediately in the amount of $1,000, he was held in the Maricopa County Jail.

On 10 April, 1963, a bond titled "Bail Bond—Divorce", in the amount of $1,000 was filed and the husband was released. The appellant, National Automobile and Casualty Insurance Company, was the surety on the bond signed by Fred Q. Reed, Attorney-in-Fact. The bond stated, among other things,

"We, as principal, and the National Automobile and Casualty Insurance Company, a California corporation, as surety, hereby undertake that the said Ernest Queck will appear and answer the charge above mentioned in whatever court it may be prosecuted, and will at all times hold himself amenable to the orders and processes or the court, and, if convicted, will appear for judgment, and render himself in execution thereof, or, if he fails to perform "either of these conditions that he will pay to the State of Arizona the sum of one thousand dollars ($1,000.-00)."

The bond also had stamped on it the following:

"Note—the purpose of this bond is to guarantee the appearance of the defendant at all proper legal hearings, and cannot be construed as a guarantee for failure to provide payments, or back alimony payments, or fines or wage law claims."

Hearing was held on 19 April, 1963, at which time both the defendant husband and plaintiff wife were present in person and represented by counsel. The minutes reflect the following:

"IT IS ORDERED finding defendant in contempt for failure to make payments ordered by the Court. Plaintiff's counsel stipulates that Writ of Ne Exeat may be quashed at end of the year if arrearages are paid to date at which time the Court may quash writ.

"Having found the defendant in contempt of the Court, if defendant does not comply with its order, the Court will have no alternative by (sic) that of putting defendant in jail."

On 29 April, 1963, the wife petitioned the court for a "CITATION IN CONTEMPT AND FORFEITURE OF BOND ON NE EXEAT". The verified petition stated that the wife was informed and believed that the defendant husband had terminated his employment, moved out of his residence, and may have left the jurisdiction. The wife further petitioned the court to order that the husband appear before the court to show cause why he should not be held in contempt, and that the National Automobile and Casualty Insurance Company produce the defendant or show cause why the surety bond should not be forfeited and disbursed to the plaintiff in the following manner: (1) to pay all arrearages, (2) to pay all attorney's fees, and (3) the balance, if any, to be held by the Clerk, to be disbursed as and for the support of the minor child, until exhausted.

An order to show cause was signed the same day ordering the National Automobile & Casualty Insurance Company to produce the defendant, Ernest Queck, at 11:00 a.m., 10 May, 1963, or to appear and show cause why the bond should not be forfeited. The petition and order to show cause was served on the said National Automobile & Casualty Insurance Company by serving the Director of Insurance on 30 April, 1963. The sureties were later given until the 24th day of May to produce the husband and upon failing to do so, the court signed an order and judgment, filed 7 June, 1963, as follows:

"THEREFORE, IT IS ORDERED that the bond on ne exeat heretofore approved on April 9th, 1963, and filed herein on April 10th, 1963, be and the same is hereby forfeited; the said National Automobile and Casualty Insurance Company and Reed Bail Bond Company are directed to pay forthwith to the Clerk of the Superior Court of the County of Maricopa, the sum of one thousand dollars ($1,000.00) for the benefit of plaintiff, Evelyn L. Queck, said payment to be made in the above titled and numbered cause.

"IT IS FURTHER ORDERED that upon receipt of the sum of one thousand dollars ($1,000.00) from respondents, the Clerk of the Superior Court pay to plaintiff, Evelyn L. Queck, and her attorneys, said sum of one thousand dollars ($1,000.00) with credit to be given to the defendant, Ernest E. Queck, on the arrearages of payments heretofore ordered by this Court.

"IT IS FURTHER ORDERED that, upon payment of said sum to plaintiff and her attorneys by the Clerk of said Court, plaintiff shall submit to this Court for approval a memorandum showing the application of said funds to the arrearages heretofore ordered and the balance of said arrearages at date of said memorandum.

"IT IS FURTHER ORDERED that plaintiff petitioner, Evelyn L. Queck, have judgment against respondents,

National Automobile and Casualty Insurance Company and Reed Bail Bond Company, the sum of one thousand dollars ($1,000.00) together with interest at the rate of 6% per annum at the date of judgment until paid; that the said judgment may be satisfied by payment to the Clerk of the Superior Court as hereinabove ordered.

"DONE IN OPEN COURT, this 24th day of May, 1963.

/s/ Kenneth C. Chatwin,
Judge of the Superior Court."

The appellants first contend that the court erred in granting a writ of ne exeat for the reason that the writ of ne exeat is not authorized by our constitution or statutes and is not a part of our adopted common law.

■■ This being a matter of first impression in the State of Arizona, we feel it proper to discuss the origins of this old, but seldom used writ. The forerunner of this writ in ancient common law appears to have been a writ *de securitatem invenienda* which was designed to prevent members of the clergy in England from departing the realm to visit the Papal See. It was thus limited in use to ecclesiastics only. Sometime between the reign of John (1199–1216), and Edward I (1272–1307), or possibly even earlier according to some authorities, the writ of *ne exeat regno* was first used as a high prerogative writ founded on the duty of the subject to defend the King and his realm. It was applied to subjects and foreigners alike, to prevent them from leaving the kingdom. It was primarily used for political purposes or purposes of the safety of the state and benefit of the realm. Some believe that the language of the writ itself was taken from a facsimile under Roman law of *ne exeat republica*, i.e., " '[l]et him not go out from the republic' ", (Foote v. Foote, 102 N.J.Eq. 291, 140 A. 312 [1928]). When thus used it was considered then and still is a part of the Crown's prerogative at common law. The general American rule is that it is no longer to be considered a prerogative writ, but is

an ordinary or mesne process of equity and no writ of ne exeat may be granted unless a suit in equity be commenced. Judson v. Judson, 8 F.R.D. at 336 (1943).

By the reign of Elizabeth 1st (1558–1603) the practice had arisen of using a writ of ne exeat for the enforcement of private rights. The use of the writ in aid of private persons supposedly arose from custom. Lord Eldon said:

"How it happened that this great prerogative writ, intended by the laws for great political purposes and the safety of the country, came to be applied between subject and subject, I cannot conjecture."

\*   \*   \*   \*   \*   \*

"Nevertheless, \* \* \* 'the law is settled, that in the case of an equitable demand, when the person against whom it is made is going out of the kingdom, you may, by the King's writ of ne exeat regno, prevent him from going, the object being to oblige him to give security to abide the decree'." Flack v. Holm, 1 Jac. and Walk., 405 at 413, 414 (1820), 21 The Revised Reports 202.

■■ It is thus clear that at the time we severed our connections with England and became a nation, the writ of ne exeat was well developed in the English common law as a form of equitable bail. There appeared to be two requirements in equity for the issuance of the writ: (1) the threatened departure of the defendant from the jurisdiction, and (2) a resulting defeat of the court's power to give effective in personam relief due to its loss of control over the defendant's person. United States v. Robbins, D.C., 235 F.Supp. 353 (1964). The writ itself is directed to the sheriff commanding him to commit the party to custody until he gives security in the amount set by the court.

"But both the English and the American courts have established and adhered to the rule that ne exeat will issue only for the enforcement of equitable pecuniary demands, presently payable. To this arbitrary rule, two exceptions have been recognized. The writ will be granted, on application of a wife, to prevent the threatened departure of her husband with intent to evade a decree for the payment of alimony, \* \* \*." 29 Harvard Law Review 206 (1915).

"The writ of ne exeat is in rather common usage in divorce actions but is seldom issued in other actions because the occasion for its demand rarely arises." Kirby v. Kirby, 185 Tenn. 408, 206 S.W.2d 404 at 405 (1947).

■ Article 6, section 14 of the Arizona Constitution, A.R.S. (adopted, election 8 November, 1960) states as follows:

"Section 14. The superior court shall have original jurisdiction of: 1. Cases and proceedings in which exclusive jurisdiction is not vested by law in another court.

\*   \*   \*   \*   \*   \*

"9. Divorce and for annulment of marriage.

\*   \*   \*   \*   \*   \*

"11. Special cases and proceedings not otherwise provided for, and such other jurisdiction as may be provided by law."

Our Superior Court as a court of general jurisdiction, unless specifically limited, has inherent power to carry out and give force and effect to the exercise of the jurisdiction enumerated in Section 14 of Article 6 of the Arizona Constitution. Our statute has stated as much:

"§ 1–201. Adoption of common law; exceptions. The common law only so far as it is consistent with and adapted to the natural and physical conditions of this state and the necessities of the people thereof, and not repugnant to or inconsistent with the constitution of the United States or the constitution or laws of this state, or established customs of the people of this state, is adopted and shall be the rule of decision in all courts of this state."

In construing substantially the same statute (1–201 A.R.S.), our Supreme Court has stated:

"We agree that the rule laid down by the Supreme Court of New Mexico is the one applicable to Arizona, and hold that the 'common law' referred to by our Legislature at various times means the unwritten or common law of England, together with the acts of parliament of a general nature, and not local to Great Britain, which had been passed and were enforced at the time of our separation from the mother country so far, of course, as they are suitable to our wants, conditions, and circumstances." John W. Masury & Son v. Bisbee Lbr. Co., 49 Ariz. 443, 463, 68 P.2d 679, 688 (1937).

Our Rules of Civil Procedure also support this, as witness Rule 64 of the Arizona Rules of Civil Procedure, 16 A.R.S.:

"At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by law. The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether the remedy is ancillary to an action or must be obtained by an independent action."

▇▇ We believe and therefore hold, that the Superior Court, in aid of its equity jurisdiction in a divorce case, has the inherent power to issue a writ of ne exeat when the ends of justice so require. In the instant case, there being a concurrence of alimony and support due and owing and an intent to leave the court's jurisdiction, the writ was properly issued.

▇▇ We are aware that it is a remedy of great severity, since the writ acts as a restraint on the individual against whom it is issued, and it should be granted only in circumstances which clearly warrant its use. It should issue only from the necessities of a given case and to prevent a failure of justice. Although based on a specific statute the principle announced is the same and we quote with approval the Nevada court as follows:

"In anticipation that this holding as precedent may otherwise become far reaching, it must be recognized that the remedy of arrest as a preventive measure is an extreme one. The legislative authorization of such a remedy based upon probability is an extraordinary grant of power to the courts and carries with it extraordinary judicial responsibilities. The extensive discretion so granted assumes the highest of judicial wisdom and, accordingly, demands the highest degree of consideration in its exercise." Summers v. District Court, 2nd District, Washoe County, 68 Nev. 99, 227 P.2d 201 at 205 (1951).

▇▇ The appellants next contend that even if the writ of ne exeat is valid, that both by law and by the terms of the bond the money forfeited must be paid to the State Treasurer and cannot be used to satisfy the obligation of the defendant-husband to pay support and alimony and attorney's fees to the wife. Appellants point out that the bond contained on its face a limitation that it could not

"* * * be construed as a guarantee for failure to provide payments, or back alimony payments, or fines or wage claims."

Were the writ of ne exeat a statutory writ, the bond would be governed by the statute itself:

"The bond in question is a little different in form and language to the above-quoted statute. Since, however, the bond is furnished because of the statutory mandate we shall construe the bond by the terms of the statute." Commercial Standard Insurance Com-

pany v. West, 74 Ariz. 359 at 361, 249 P.2d 830 at 831 (1952).

In the instant case, the writ being a common law rather than a statutory writ, we must construe the bond in conformity with the order signed by the court, and we will agree with appellant that the bond is to be tested by said order. People, for Use of Sochet v. Sochet, 72 Colo. 351, 212 P. 832 (1923). The order for the writ of ne exeat in the instant case reads in part as follows:

"IT IS ORDERED that a Writ of Ne Exeat staying the defendant, Ernest E. Queck, from departing into parts beyond this State and out of the jurisdiction of this Court without leave of Court first had, issue as prayed for in said petition, and that the Clerk endorse upon said writ that the defendant be required to give bond with security in the sum of one thousand dollars ($1,000.00)."

The appellants, in conformity with this order, selected the bond and the language used therein. The purpose for which this bond was issued was apparent from the order of the court for the writ of ne exeat. The appellants may not alter or amend the order by the terms of the bond, and any conflict between the bond and the order will be resolved in favor of the order.

■ An Order to Show Cause directed to the National Automobile & Casualty Insurance Company was signed the 29th day of April, 1963, by the Judge of the Superior Court and a copy of that order together with the petition for citation in Contempt and Forfeiture on Bond Ne Exeat was served upon the Director of Insurance on the 30th day of April, 1963. On 10 May, Reed Bail Bond was ordered to produce one Ernest Queck in court on 24 May, 1963, or the bond would be forfeited. The record shows that Reed Bail Bond was represented and appeared of record before the Superior Court on 10 May, 1963, and was also present on 24 May, 1963, when arguments were heard concerning the forfeiture of the bond. The sureties upon this bond guaranteed that the defendant, Ernest Queck, would

appear, or failing to do so, that an amount up to $1,000 would be forfeited. This conforms to the order for the writ. They cannot complain if this is exactly what happened. The bond was then ordered forfeited, and we hold properly so.

■ The fact that the money was paid over to the wife, for her support and the support of her children, certainly does not conflict with the order of the court in requiring the defendant to post a bond under the writ of ne exeat. This was the purpose of the writ, that is, to keep the defendant in the jurisdiction and upon his failure to do so, to forfeit the bond or so much of it as proper and pay it over to the wife as and for alimony, support and necessary attorney fees and costs as set forth in this opinion. The amount of the bond insured that if the defendant did leave, his wife and family would not thereby be rendered destitute. We hold that the amount to be forfeited may be paid over to the wife and children for their support and maintenance.

■ We now consider the amount forfeited by the court and ordered paid over to the wife for back alimony, support, attorney's fees and future support and alimony. At common law, the writ will issue for amounts due and owing only and not for amounts to become due and owing in the future:

"The writ and its attributes are almost entirely derived from the English authorities and practices. Story, Eq., Jur., 14th Ed., § 1915. These authorities and practices were to the effect that alimony decreed to a wife would be enforced by a writ of ne exeat, but only to the extent of arrears actually due, against a husband who was about to quit the realm." Cohen v. Cohen, 319 Mass. 31, 64 N.E.2d 689, 163 A.L.R. 362 (1946).

Attorney's fees necessary for preparation and hearings on the writ being, in effect, a part of the cost of collecting the amount past due, may be included in the amount forfeited, but amounts not yet due and owing at the time the writ was issued may

not be included in such amount. For that reason, the matter is remanded for a determination of the amount due and owing for alimony, support cost and attorney's fees at the time the writ was issued, together with necessary cost and attorney's fees for the preparation and hearing on the writ itself. That amount, up to the amount of the bond, may then be paid over, and the remainder, if any, returned to the appellants.

The matter is remanded for further proceedings not inconsistent with this opinion.

STEVENS, C. J., and DONOFRIO, J., concur.