JUNE H. BEVERIDGE *v.* LESLIE A. BEVERIDGE
(3459)

DUPONT, C. J., SPALLONE and BIELUCH, Js.

Argued December 4, 1985—decision released April 15, 1986

*William C. Galligan,* for the appellants (Russell D. Beveridge et al.).

*John R. Logan,* for the appellee (defendant).

SPALLONE, J. The sureties on a bond on which the defendant was principal are appealing from a decision of the trial court opening and reversing its previous order discharging the sureties from their obligation and reinstating the bond.

On December 9, 1971, judgment was rendered dissolving the marriage of June H. and Leslie A. Beveridge. At that time, the court ordered Leslie Beveridge to pay $1 per year alimony and $40 per week for the support of each of three minor children. He

never paid any alimony or support. In addition, he kept his whereabouts secret from the plaintiff.

Early in 1983, the plaintiff learned that her ex-husband was residing in Connecticut. By this time, the arrearage of alimony and support payments exceeded $34,000. On March 8, 1983, the plaintiff filed a motion for contempt of court against her ex-husband for his violation of the court orders. Accompanying the motion was an application for a writ of ne exeat. The plaintiff requested that the writ issue to prevent her ex-husband from leaving the state until the arrearage of alimony and support was paid. The application was granted by the court, *Daly, J.*, ex parte and a writ of ne exeat issued, "conditioned that [Leslie A. Beveridge] shall not depart from this state without permission of the court pending the final decision of the motion [for contempt] referred to in the application. . . . " The writ fixed a penal bond in the amount of $35,000 as surety, which Leslie Beveridge was unable to pay. Consequently, he was taken into custody and incarcerated.

On March 22, 1983, in response to Leslie Beveridge's motion for modification of the bond, the court allowed Russell D. and Ruth S. Beveridge to post a real estate bond in the penal amount, as a result of which Leslie Beveridge was released. The plaintiff and her ex-husband appeared on April 5, 1983, at the contempt hearing. At that time, they entered into a stipulation which provided that Leslie Beveridge make payment of the arrearage of $34,082 in accordance with an agreed schedule. It was also ordered by the court at that time that the surety bond would remain in effect until final payment had been made. The sureties, Russell and Ruth Beveridge, were not parties to the stipulation.

Leslie Beveridge failed to make all payments required by the stipulation, with the result that the plaintiff filed

another motion for contempt. On August 30, 1983, these parties again stipulated to a further modification of the earlier order. The stipulation also stated that the plaintiff would not commence suit on the bond against the sureties as long as Leslie Beveridge did not default on further payments. The sureties did not participate in this stipulation. Leslie Beveridge failed to make payments under this obligation, resulting in the plaintiff's bringing of a separate action on the bond against the sureties, which she subsequently withdrew.

Russell and Ruth Beveridge, claiming that when they agreed to become sureties they understood that the bond by its express terms was to guarantee Leslie Beveridge's appearance in court at the April 5 contempt hearing, filed a motion on December 6, 1983, to be discharged as sureties on the bond. The court, *Covello, J.,* on July 17, 1984, granted the motion releasing Russell and Ruth Beveridge as sureties, but reinstated "the order of March 8, 1983 and direct[ed] that [Leslie Beveridge] be committed to the custody of the Commissioner of Corrections until such time as there is a hearing on the motion for contempt." The next day, at the request of Leslie Beveridge's counsel, a reargument was allowed. Immediately following this hearing, the court granted the motion to open, denied the motion to dissolve the bond, reinstated the bond and ordered Leslie Beveridge released from custody. The sureties have appealed from the order reinstating the bond. They claim as error the court's failure to discharge them as sureties on the bond. We agree.

We first hold that the court order reinstating the bond constitutes an appealable final judgment because it terminates a separate and distinct proceeding. Our Supreme Court recently articulated the test for determining what constitutes a separate and distinct proceeding: "[t]he question to be asked is whether the main

action could proceed independent of the ancillary proceeding." *State* v. *Parker,* 194 Conn. 650, 654, 485 A.2d 139 (1984). The writ of ne exeat has been held to be an extraordinary ancillary writ. *Elkay Steel Co.* v. *Collins,* 392 Pa. 441, 450, 141 A.2d 212 (1958). Applying that standard to the present case, the plaintiff's motion for contempt for nonpayment of support and alimony payments can certainly proceed independent of the ancillary ne exeat proceeding, which tests the legality of the reinstatment of the sureties on the bond on appeal.

In order to assist in understanding the implications of the issuance of a writ of ne exeat and of the obligations of sureties on a bond issued pursuant thereto, we look to the history of this ancient writ. Antedating this writ, in early common law, there existed a writ de securitatem invenienda which was utilized to prevent members of the clergy in England from departing the realm to visit the Papal See. *National Automobile & Casualty Ins. Co.* v. *Queck,* 1 Ariz. App. 595, 599, 405 P.2d 905 (1965). Thus, it was limited to restricting the movement only of ecclesiastics. Between the twelfth and fourteenth centuries, the writ evolved into a high prerogative writ, available to and utilized by the king to prevent subjects and foreigners, alike, from leaving the kingdom, which became known as a writ of ne exeat regno. It was predicated on the duty of the subject to defend the king and his realm and was primarily used for political purposes or to secure the safety of the state and the benefit of the realm. Id. How this royal prerogative writ came to private use is uncertain but between the sixteenth and seventeenth centuries the practice had developed of using a writ of ne exeat to enforce a private right. Id. Such use of the writ continues to the present day. The writ came to this country with the body of English common law that we adopted as our own. Some state courts base their

authority to issue the writ on their inherent power to apply measures available at common law. Other states have provided for the writ by statute. In many states the writ has been abolished by statute. See 57 Am. Jur. 2d, Ne Exeat § 1 et seq.; 65 C.J.S., Ne Exeat § 1 et seq.

In Connecticut, the writ of ne exeat is provided for by General Statutes § 52-489, which provides: "The superior court for any judicial district, and, when such court is not in session, any judge thereof, may grant and enforce writs of ne exeat, according to the course of the common law." By the very language of the statute, we must look to the common law for guidance as to its application and the nature of the obligations and rights of the parties.

The rule adopted generally in the United States is that the writ is no longer to be considered a prerogative writ, but as an ordinary or mesne process in equity, and no writ of ne exeat may be granted unless a suit in equity is commenced. *National Automobile & Casualty Ins. Co.* v. *Queck,* supra, 599–600. The Superior Court of our state has held that the writ issues on motion or application supported by affidavit or on an original complaint or bill in equity. *Freeman* v. *Freeman,* 17 Conn. Sup. 125, 126 (1950). In *Lyon* v. *Lyon,* 21 Conn. 185, 199–200 n.(a) (1851), Justice Storrs, in a statement subjoined to the court's opinion ex relatione amici, discussed with approval the circumstances under which the writ of ne exeat issued and a bond as surety is given. The circumstances in this case track the procedure approved by Justice Storrs 135 years ago.

In essence, a writ of ne exeat is an order, directed to the sheriff, commanding him to commit a party to custody until he gives security in the amount set by the court to guarantee his appearance in court. *National Automobile & Casualty Ins. Co.* v. *Queck,* supra, 600. The writ

of ne exeat is executed in all respects like an ordinary capias, and the bond is taken in the same way. The defendant, if arrested under the writ, may give bond at any time and be discharged. *Griswold* v. *Hazard,* 141 U.S. 260, 280–81, 11 S. Ct. 972, 35 L. Ed. 678 (1891).

There are no statutory standards to guide us in construing the bond here. Therefore, we must construe the bond in conformity with the writ of ne exeat signed by the court, and we hold that the bond is to be tested by that writ. See *People* v. *Sochet,* 72 Colo. 531, 535–36, 212 P. 832 (1923). The writ of ne exeat in pertinent part requires Leslie Beveridge "to give a bond, with sufficient surety, in the penal sum of $35,000 . . . conditioned that he shall not depart from this state, without permission of the Court pending the final decision of the motion [for contempt] referred to in the application; and if he shall neglect or refuse to give such bond, upon your demand you are directed to arrest his body, and commit him to the care of the commissioner of correction. . . . "

The forfeiture clause in the bond executed by Leslie Beveridge and the sureties expressly states and limits the liability under the bond by its language: "[N]ow, therefore, if the principal shall fail to appear before said court on the date and time aforementioned [April 5, 1983, at 9:30 a.m.] and on any date thereafter to which said action may be continued, the undersigned shall pay to the plaintiff the penal sum [of $35,000] herein stated." Read together, the writ and bond, in logic and reason, can lead to no other conclusion but that the bond was in the nature of an appearance bond and not a performance bond. Regardless of the plaintiff's claim, the bond as submitted and as accepted by the court secures only the appearance of Leslie Beveridge in court to answer to the contempt proceeding, which he

did on April 5, 1983. Nothing in the bond can be interpreted as an agreement by the sureties to guarantee payment of the arrearage of alimony and support upon which the motion for contempt was predicated. Where the bond in a ne exeat proceeding is for appearance only, and contains no language with regard to performance, the bond is in effect solely an appearance bond. See *Buonanno* v. *Caldwell,* 160 Fla. 889, 890–92, 37 So. 2d 159 (1948).

When the sureties produced Leslie Beveridge in court on April 5, 1983, to answer the contempt charge to which the writ of ne exeat was ancillary, they were at that time entitled to be released from the obligation of their surety bond except if, in accordance with the terms of the bond, the case was continued. Where a ne exeat bond is conditioned only upon the appearance of the principal, and the surety produces him in open court and requests the release of the bond, the court has no alternative other than to discharge the surety. *Aiken* v. *Aiken,* 81 So. 2d 757, 759–60 (Fla. 1955). Thereafter, unless otherwise ordered by the court, the matter stands as if no bond had been made and the principal must be surrendered to custody until such time as he makes a satisfactory bond. Id. The court's order of April 5, 1983, that "[t]he defendant's bond with surety dated March 22, 1983, shall remain in effect until the final payment has been made" was erroneous because the condition of the bond was that the defendant appear in court on April 5, 1983, and on any date thereafter to which the action was continued. The contempt action was not continued to another date, but heard and decided that day. The continuance for payment of the arrearage according to the prescribed schedule was not a continuance under the bond.

As far as the sureties were concerned, their obligation under the bond ended on April 5, 1983. The further contempt hearing held on August 30, 1983,

concerned a later and new motion for contempt. The obligation as sureties for the appearance of Leslie Beveridge did not extend to this proceeding. Accordingly, the parties' stipulation and the court order continuing the bond "in effect" did not affect the sureties' obligation on their lifeless bond. The order of November 22, 1983, on a further motion for contempt was silent concerning the bond and found no contempt. Therefore, when the sureties did in fact move for a discharge on December 6, 1983, the court was mandated to honor their request. See *Aiken* v. *Aiken,* supra.

We conclude further that once the court granted the sureties' motion to be discharged from their obligation under the bond, the court, under the circumstances in this case, was without authority to open its order on the plaintiff's motion and to bind them to a new obligation without their consent.

There is error, the trial court's order reinstating the bond is set aside and the case is remanded with direction to order the termination of the bond and the discharge of the sureties from all obligations thereunder.

In this opinion the other judges concurred.